**Opinion issued April 2, 2020**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

## NO. 01-18-01129-CR

————————————

**JERRY EUGENE GARNETT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 239th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 76561-CR**

---

**MEMORANDUM OPINION**

Jerry Garnett was convicted by a jury of indecency with a child and aggravated sexual assault of a child, his girlfriend's four-year-old daughter, A.H. He was sentenced to 15 years and 40 years of confinement. In four issues, he contends the evidence was insufficient to support either conviction, the trial court

erred in denying his motion for mistrial, and the trial court erred in allowing hearsay evidence and testimony from an outcry witness.

We affirm.

## Background

A.H., who we will refer to by the pseudonym, Amy, is the daughter of Pam and the granddaughter of Laura.[1] Amy lived with Laura. Pam lived in another home with Pam's grandfather. Pam's boyfriend, Jerry Garnett, would stay over at Pam's house frequently.

In May 2015, when Amy was four years old, Pam asked Laura whether Amy could spend the night with Pam during Mother's Day weekend. Laura agreed. The jury heard evidence that Pam and Amy spent some time at Pam's house then went to Pam's sister's house, where Pam used marijuana. They returned to Pam's house late that night. Pam helped Amy use the restroom before bed. Pam and Garnett slept in a twin-sized bed. Amy slept on a pallet on the floor next to the bed. Before falling asleep, Pam took an Ambien pill as a sleep aid.

What happened during the night is disputed. According to the State's witnesses, Garnett took Amy to the bathroom in the middle of the night, removed her shorts and underwear, and committed sexual acts on the four-year-old child. Specifically, he inserted his finger into her vagina and licked her vagina with his

---

[1]     All family members will be referred to by first-name pseudonyms for the privacy of the complainant, A.H.

2

tongue. He then apologized, asked her not to tell anyone, and returned her to the bedroom. According to Garnett, nothing happened. Or, if something did happen, it was someone else who did it.

Amy testified at trial in September 2018. At that point, she was eight years old and in the third grade. She testified she could not remember any of the events or of discussing them after they occurred. She had no memory of that night four years earlier.

Pam testified next. First, she discussed what happened with her three older children who had stopped living with her. She stated they were placed in CPS custody and she was given certain tasks and objectives to meet before the three children would be returned to her, including no longer living with her then-husband. Pam testified she did not leave her then-husband. As a result, the three older children were not returned to her. Instead, their paternal grandmother became their managing conservator.

Pam then testified about the events when Amy—her youngest child—spent the night with her. According to Pam, the only people at the house that day were Pam, Garnett, Amy, and Pam's grandfather. They stayed in most of the day watching movies. In the evening, Pam, Garnett, and Amy went to Pam's sister's house in Danbury. There, Pam smoked marijuana and her sister's boyfriend drank heavily. No one else consumed alcohol or drugs, according to Pam. They left her

sister's house around 11:00 p.m. When they returned to Pam's house, Pam made a pallet for Amy near the twin bed Pam shared with Garnett. Pam helped Amy use the restroom before bed. Pam smoked marijuana and took Ambien, then went to sleep. She woke up once, saw that Amy was asleep, and fell back to sleep.

According to Pam, Amy woke up around 8:00 a.m. Sunday morning, which woke Pam up. Garnett left soon after. Pam and Amy waited for Laura to come pick up Amy. A short time after Laura picked up Amy, Laura called Pam and told her about the allegation. Pam drove to Laura's house. The police were already there. Pam testified that she yelled at Laura. At the time, Pam believed Laura had coached Amy to make accusations against Garnett.

Pam then listened as Amy told a police officer about the night before and that Garnett was the person who did it. The police indicated that Amy would need to be physically examined and that Pam should go with Amy to the examination, but Pam chose not to go. Instead, she left with Garnett.

Pam testified she asked Garnett about the accusations later that day. He told her he did not do anything wrong—he took Amy to the restroom during the night and, in his words, "helped her wipe" her "pussy." Pam posited that Amy might have tried to wake her up for help using the restroom but could not because of the "sleeping pills."

4

Pam was interviewed by Detective V. Green. Pam did not disclose to Detective Green that Garnett admitted to taking Amy to the restroom in the middle of the night. Pam explained that she did not tell the detective because she did not believe Garnett had touched Amy and she was "defending" Garnett. Pam did not tell Detective Green about smoking marijuana or taking Ambien that night either. Pam testified she was worried about losing custody of Amy.

Pam acknowledged she took Garnett's side in the criminal investigation. When the prosecutor asked her why, Pam replied, "Because I loved him." Eventually, Pam agreed to allow Laura to be Amy's conservator. Pam acknowledged that her focus was on defending Garnett, not on Amy. Pam testified that she continued to date Garnett "until he went to jail."

The next witness was Laura. She testified she allowed Amy to go to Pam's house overnight on Mother's Day weekend. When Amy returned the next day, she was wearing the same shirt and shorts as the day before. Within a couple minutes of Amy returning to Laura's house, Laura helped Amy go to the restroom. That is when Laura realized Amy was no longer wearing underwear under her shorts. Laura asked Amy what happened to her underwear. Amy looked scared to answer,

then she told Laura that Garnett had taken them off, touched her "who-who,"[2] and then said he was sorry and he would never do it again. Laura called the police.

Laura confirmed that she gave a written report to the police in which she recounted Amy saying that Garnett touched her "who-who" while her mother, Pam, was asleep.

Investigator J. Moore with the Brazoria Police Department testified that she arrived at Laura's house after the call to the police. She was there when Pam arrived. Pam was very angry. Moore asked Amy what happened. Amy recounted the same version of events she had told Laura—that Garnett had touched her who-who.

Detective Green testified about her investigation. Early on, she watched a video of Amy's forensic interview. After watching the video, Green submitted the evidence from Amy's physical examination to the Department of Public Safety for analysis in connection with a claim of "finger penetration." According to Green, Amy had been "very clear" in her assertions.

Green testified she interviewed Garnett during the investigation. A recording of that interview was played for the jury.

The next several witnesses testified about Amy's forensic interview and physical examination. R. Fletcher is a Sexual Assault Nurse Examiner. She

---

[2]     Testimony from Pam and Laura established that Amy had been taught to refer to her vagina as a "who-who."

examined Amy the day Amy told Laura that Garnett had touched her. Fletcher explained the four steps of a SANE exam: (1) obtain a medical history, (2) complete a head-to-toe physical examination, (3) complete an anogenital examination, and (4) collect forensic evidence. Fletcher received Amy's medical history from Laura then completed the remaining steps with Amy.

Fletcher testified that no visible signs of trauma or injury were noted on Amy's physical exam. She explained that 95 percent of child abuse cases have a "normal" exam finding, meaning there is no physical injury or trauma noted. She also testified that the accusation of "touching" is consistent with finding no signs of trauma because a touch generally would not "leave any visible injury." In other words, Fletcher testified the examination's finding of no visible injury or trauma was consistent with the allegations.

T. St. John is a retired forensic nurse who worked with the Brazoria County Alliance for Children. She interviewed Amy about two weeks after the incident. Amy told her that Garnett had touched her "with his finger in my who-who." St. John asked Amy whether she had clothes on at the time, and Amy said, "No, I didn't." St. John asked Amy where her clothes were, and Amy replied, "I don't know 'cause Jerry [Garnett] took them off." Amy did not disclose to St. John that there had been any oral contact with her vagina.

The next witness, A. Diop, is a forensic interviewer at The Children's Assessment Center (CAC). Diop testified about her interview of Amy. Diop and Amy were the only two people in the room during the interview. Diop established that Amy knew the difference between the truth and a lie. The two established what terms Amy used for her various body parts. When Diop asked what happened with Amy's body, Amy said that Garnett touched her who-who with his hand and his tongue. Diop asked clarifying questions. Amy said Garnett "licked" her who-who with his tongue. Diop asked "sensory detail" questions, and Amy described the event by saying it "tickled." She described the act as "yuck," and then said that no one is supposed to lick your who-who. Amy said this happened in the bathroom while her mother was asleep.[3]

A. Denton is an investigations supervisor with the Texas Department of Family and Protection Services, commonly known as CPS. She observed Amy's forensic interview through closed-circuit television as Amy was interviewed. She testified that Amy, at age four, discussed things "that a child of that age should have no knowledge of," and she described the interview as "painful to watch." Denton did not interview Amy separately. She explained the Department's policy is to have a child endure only one interview. The forensic interviewer interviews

---

[3]     An audio recording of the CAC forensic interview was admitted as evidence. Garnett does not raise an appellate issue regarding its admission into evidence.

the child, and then law enforcement, child services, and others watch the single interview to conduct their investigations.

Three forensic scientists testified. Only Amy's DNA was found in swabs taken from her body. Some male DNA was found on Amy's shorts, but Garnett could not be included or excluded as the source of that DNA.

There was testimony from several of these witnesses about Amy's missing underwear. Several testified that Pam had located the underwear on her bathroom floor after learning of the accusation. All the witnesses agreed that the police never asked Pam to turn over the underwear for DNA processing or any other purpose. Detective Green testified it "probably" was a mistake not to collect the underwear.

When these witnesses finished testifying, the State and Garnett rested. Both sides gave closing arguments, and the court's charge was read to the jury. The jury was presented with multiple offenses on which to convict, some based on contact with Garnett's finger and others based on contact with Garnett's mouth.

There were two possible offenses related to the allegation that Garnett touched Amy's genitals with his finger. One was aggravated sexual assault for penetrating Amy's sexual organ with his finger. The other was the lesser-included offense of indecency with a child by contacting Amy's sexual organ with his finger. The jury convicted Garnett of the lesser-included offense, having concluded that Garnett touched Amy's genitals.

The jury also convicted Garnett of aggravated sexual assault for the separate offense of contacting Amy's sexual organ with his mouth.

Garnett was sentenced to 15 years' and 40 years' confinement on these two convictions. Garnett appealed.

## Legal Sufficiency of the Evidence

When an appellant in a criminal case raises an issue that, if successful, would result in a remand for a new trial and another issue that, if successful, would result in an acquittal, we will consider first the issue that could lead to an acquittal. *See Lucas v. State*, 245 S.W.3d 611, 612 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). Accordingly, we review, first, Garnett's issue challenging the legal sufficiency of the evidence.

### A.  Standard of review

Legal sufficiency of the evidence is reviewed under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318–20 (1979). *See Brooks v. State*, 323 S.W.3d 893, 894–913 (Tex. Crim. App. 2010). Under the *Jackson* standard, evidence is insufficient when, considered in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 317–19; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider both direct and circumstantial evidence as well as all reasonable inferences that may be

drawn from that evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to witness testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). The jury may choose to believe or disbelieve any part of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.— Houston [1st Dist.] 2005, no pet.). Inconsistencies or contradictions in a witness's testimony do not destroy that testimony as a matter of law. *McDonald v. State*, 462 S.W.2d 40, 41 (Tex. Crim. App. 1970).

We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State,* 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the jurors. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

**B.** **There was legally sufficient evidence of the challenged elements**

Garnett argues that the jury could not have found him guilty of either offense beyond a reasonable doubt because there was inconsistent evidence. For example, Amy told one person about the licking, but she did not tell the others. Also, there was evidence that Amy's underwear was not on her when she returned to Laura's house, but the police did not undertake to analyze the underwear during the criminal investigation.

To successfully argue that a conviction is based on legally insufficient evidence, more is required than pointing to inconsistent evidence. Legally insufficient evidence exists in one of four contexts: (1) no evidence exists that is probative of an element of the offense in the record; (2) only a "modicum" of evidence exists that is probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the alleged acts do not establish the criminal offense charged. *See Jackson*, 443 U.S. at 314, 320; *Herrera v. State*, 526 S.W.3d 800, 808 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

We consider whether there was legally sufficient evidence for each of the two offenses that resulted in convictions.

**1.** **Indecency with a child by contact**

The offense of indecency with a child by contact required evidence that a person, among other possibilities, "engages in sexual contact with the child or

causes the child to engage in sexual contact." TEX. PENAL CODE § 21.11(a)(1). "Sexual contact" includes the following acts, "if committed with the intent to arouse or gratify the sexual desire of any person": "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child." *Id.* § 21.11(c)(1).

Garnett argues there was no evidence that his touching of Amy's genitals with his finger, as found by the jury, was with an intent to gratify his sexual desire. But the requisite specific intent to arouse or gratify sexual desire can be inferred from the defendant's conduct, his remarks, and all surrounding circumstances. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981); *Santos v. State*, 961 S.W.2d 304, 308 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd); *see also Couchman v. State*, 3 S.W.3d 155, 163 (Tex. App.—Fort Worth 1999, pet. ref'd). An oral expression of intent is not required, and a defendant's conduct alone is sufficient to infer intent. *Couchman*, 3 S.W.3d at 163.

In applying the legal sufficiency standard of review, we must presume— even if it does not affirmatively appear in the record—that the factfinder resolved any conflicting inferences in favor of the prosecution, and we must defer to that resolution. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). We conclude that the recording contains legally sufficient evidence that Garnett

touched Amy's genitals. And, because intent can be inferred from the act, there is legally sufficient evidence of the requisite intent.

### 2. Aggravated sexual assault

A person commits aggravated sexual assault if he intentionally or knowingly "causes the penetration of the anus or sexual organ of a child by any means" or "causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor." TEX. PENAL CODE §§ 22.021(a)(1)(B)(i), (iii).

Garnett argues that Amy's failure to testify about the licking accusation coupled with her failure to mention anything about licking to Laura renders Amy's disclosure of licking during the forensic interview legally insufficient. We cannot agree. The outcry testimony from Diop that Amy described Garnett licking her vagina with his tongue provides legally sufficient evidence that Garnett caused the sexual organ of the child to contact his mouth. *Id.*

We overrule Garnett's first issue.

## Denied Motion for Mistrial

In his second issue, Garnett argues the trial court abused its discretion in denying his motion for mistrial.

14

## A. Standard of review and applicable law

A mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We review the denial of a mistrial for an abuse of discretion. *Id.* We must uphold the ruling if it was within the zone of reasonable disagreement. *Id.* In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct (including its prejudicial effect); (2) the effectiveness of the curative measures taken; and (3) the certainty of the conviction or punishment assessed absent the misconduct. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

## B. Trial court did not abuse its discretion in denying Garnett's motion for mistrial

While the second outcry witness, Diop, was testifying, the trial court ruled that Diop would only be allowed to testify to Amy's outcry statements related to the second-charged offense: contact between Amy's genitals and Garnett's mouth. She could not testify about the first-charged offense—contact between Amy's genitals and Garnett's finger—that Laura had testified about.

The prosecutor then asked Diop what she reported after interviewing Amy. Diop responded that the "child disclosed oral penetration by Jerry." The prosecutor then asked, "Did you also report digital penetration?" This question elicited a

15

response that violated the limitation the trial court had placed on Diop's outcry testimony. Before Garnett voiced an objection, Diop answered the question by stating, "Correct." At that point, Garnett objected that the "Court's already made a ruling about that." The trial court sustained the objection. Garnett asked for an instruction to the jury to disregard the statement. The trial court instructed the jury to disregard. Garnett moved for a mistrial. The trial court denied the motion.

"Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer . . . ." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Prejudice is incurable only when the objectionable material is clearly calculated to inflame the jury or is of such a damaging character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. *See Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009).

We conclude the objectionable question and answer about digital penetration from the witness only authorized to discuss the oral contact were not so prejudicial as to be incurable with an instruction to disregard or to overcome the presumption the jury followed the trial court's instruction to disregard for at least two reasons. First, the jury was presented with two possible offenses on which to convict Garnett for touching Amy's genitals with his finger. The lesser offense was indecency with a child based on touching the exterior of the genitals. The greater offense was aggravated sexual assault based on penetrating Amy's sexual organ

with his finger. The jury elected to convict him of the lesser-included offense of indecency with a child. The jury's rejection of the greater offense—which was the one that related to Diop's challenged testimony—in light of the jury instruction to disregard Diop's testimony on that subject, strongly indicates no prejudice resulted. Second, the challenged testimony from Diop was not the only evidence the jury received that Garnett has penetrated Amy's vagina with his finger. Detective Green testified that she reported "finger penetration" after watching the forensic interview.

In light of these consideration, we conclude the challenged statement was not so prejudicial as to be incurable with an instruction to disregard or to overcome the presumption the jury followed the trial court's instruction to disregard. *See Lee v. State*, 779 S.W.2d 913, 916 (Tex. App.—Houston [1st Dist.] 1989, pet. denied).

**Hearsay Statements to Nurse Examiner St. John**

In his third issue, Garnett contends the trial court erred when it overruled his hearsay objection to testimony from the nurse examiner, St. John, about statements Amy made to her that Garnett touched Amy's vagina with his finger.

**A. Standard of review and applicable law**

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Roberts v. State*, 29 S.W.3d 596, 600 (Tex. App.—Houston [1st Dist.]

17

2000, pet. ref'd). We will not reverse a trial court's decision to admit or exclude evidence unless the record shows a clear abuse of discretion. *Zuliani*, 97 S.W.3d at 595; *Roberts*, 29 S.W.3d at 600. An abuse of discretion occurs only when the trial court's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Zuliani*, 97 S.W.3d at 595; *Roberts*, 29 S.W.3d at 600.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Ordinarily, hearsay is inadmissible. TEX. R. EVID. 802. However, a "statement that . . . is made for—and is reasonably pertinent to—medical diagnosis or treatment; and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause" is excepted from the hearsay rule. TEX. R. EVID. 803(4).

Rule 803(4) is premised on a declarant's strong and selfish motive to tell the truth to receive proper medical diagnosis or treatment. *Taylor v. State*, 268 S.W.3d 571, 583 (Tex. Crim. App. 2008). The proponent of the evidence must show that: (1) the out-of-court declarant was aware that the statements were made for the purpose of medical diagnosis or treatment and that proper diagnosis or treatment depends upon the veracity of such statements; and (2) the particular statement proffered is pertinent to treatment or diagnosis. *Id.* at 589–91.

## B.    Any error was harmless

If the trial court erred in overruling Garnett's hearsay objection, it would be nonconstitutional error; therefore, we would reverse only if the error had a substantial and injurious effect or influence on the jury's verdict. *See* TEX. R. APP. P. 44.2(b); *Taylor*, 268 S.W.3d at 592 n.105. "We should not overturn the conviction if we have fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but slight effect." *Taylor*, 268 S.W.3d at 592. The improper admission of evidence is not reversible error, though, if the same or similar evidence is admitted without objection at another point in the trial. *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998); *see Duncan v. State*, 95 S.W.3d 669, 672 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (holding improper admission of outcry testimony was harmless error because similar testimony was admitted through complainant, pediatrician, and medical records).

As discussed earlier, the jury acquitted Garnett on the charge of aggravated assault for penetrating Amy's vagina with his finger. By its verdict, the jury rejected testimony from St. John (and others) about penetration. This supports a determination that any error in allowing St. John's to testify about the penetration was harmless. As further support for that conclusion, we note that Detective Green also testified without objection about penetration. She testified she watched the

19

video of Amy's forensic interview, found Amy's description of the events to be "very clear," and forwarded the physical examination kit for further analysis, specifically noting an allegation of "finger penetration."

Based on these considerations, we conclude any error in admitting St. John's testimony was harmless. *See Taylor*, 268 S.W.3d at 593 (holding that error in admitting complainant's statement identifying appellant to counselor was harmless).

We overrule Garnett's third issue.[4]

### Testimony from Outcry Witness Diop

Next, Garnett challenges the trial court's ruling that Diop could testify as an outcry witness about Amy's statement that Garnett licked her vagina. He asserts that statutory requirements were not met to allow the outcry testimony.

### A.    Standard of review and applicable law

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Zuliani*, 97 S.W.3d at 595. We will not reverse a trial court's decision to admit or exclude evidence unless the record shows a clear abuse of discretion. *Id.* An abuse of discretion occurs only when the trial court's decision

---

[4]    Within his third issue, Garnett argues that St. John's testimony improperly bolstered other witnesses' testimony. Garnett, though, did not make a bolstering objection to the trial court. This issue is waived. TEX. R. APP. P. 33.1(a); *Zemen v. State*, 912 S.W.2d 363, 366 (Tex. App.—Houston [14th Dist.] 1995, no pet.) (concluding appellant waived bolstering objection by not raising it with the trial court).

was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.*

Article 38.072 of the Code of Criminal Procedure provides that, if a person is prosecuted for certain enumerated, sexual-related offenses committed against a child younger than 14 years of age, so long as certain statutory criteria are met, the "first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense" may testify about the child's statements without those statements being "inadmissible because of the hearsay rule." TEX. CODE CRIM. PROC. art. 38.072, §§ 1–2. It is possible for there to be multiple outcry witnesses. *Broderick v. State*, 35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref'd).

One of the statutory requirements is that the child "testifies or is available to testify at the proceeding in court or in any other manner provided by law." TEX. CODE CRIM. PROC. art. 38.072, §2(b)(3). Garnett argues that this requirement was not met. According to Garnett, because Amy testified at trial that she did not remember anything related to the charged offenses, she was not "available" within the meaning of Article 38.072 to allow outcry testimony from Diop.

The State responds with two arguments. First, Garnett waived his argument on appeal about testifying or being available to testify. Second, Amy's testimony that she could not recall satisfies the statutory requirement of testifying. The State

21

relies on *Hollinger v. State*, 911 S.W.2d 35 (Tex. App.—Tyler 1995, pet. ref'd), in support of its arguments.

**B.    Amy testified**

In *Hollinger*, a three-year-old boy, C.L., was being babysat by his aunt. *Id.* at 36. The boy's mother, Karla, made clear that her sister was not to allow the sister's son in the home with C.L. because the sister's son had been convicted of sexually assaulting children. *Id.* The aunt nonetheless allowed her son to be in the home with C.L.

After returning to his mother, C.L. complained that his "bottom" hurt. C.L. told Karla that his cousin hurt him by putting his penis in C.L.'s bottom. *Id.* Karla observed that C.L.'s "rectum was red and irritated." *Id.* The cousin was tried for sexual assault of a child.

C.L., who was only three years old at the time of the event, testified at trial. The appellate court described his testimony thusly:

> C.L. testified, but his testimony was confusing. He stated that it was a "cop last night that hurted" his bottom. C.L. also told the jury that [his cousin] had shot him in his face and on his bottom with a BB gun. On cross-examination, C.L. said that [his cousin] had shot him with a water pistol.

*Id.* at 37. C.L. did not testify to any acts of sexual assault. *See id.*

C.L.'s mother, Karla, testified as an outcry witness under Article 38.072. *Id.* On appeal, the cousin argued that Karla's testimony was impermissible hearsay

because C.L. did not qualify as available to testify given his incompetent testimony. *See id.* at 39. The appellate court overruled the issue and affirmed the conviction. *Id.* at 40. The court concluded that the trial court undertook the statutorily required steps to assess the reliability of C.L.'s statements based on the time, context, and circumstances, including the credibility of the outcry witness. *Id.* The trial court ruled that C.L. was competent and "available" to testify. *Id.* And, importantly, C.L. did testify and was cross-examined. *Id.* The court then stated:

> C.L.'s testimony was vague and contradicted his previous statements concerning Appellant's inappropriateness with him. Even though his testimony was not harmonious with the earlier outcry statement that C.L. had made to Karla right after the incident, we believe that C.L. testified to the best of his ability, and conclude that C.L. was still "available" to testify. Therefore, all of the requirements of the outcry statute were met. We hold that the trial court did not abuse its discretion.

*Id.*

We are persuaded by the reasoning in *Hollinger* and likewise conclude that the trial court did not err in permitting Diop to testify as an outcry witness. The trial court conducted a hearing to evaluate Amy's understanding of truth versus lies, and the trial court found Amy qualified to testify. Amy then testified. She was asked questions, and she provided answers to those questions. She was cross-examined. Her testimony was not consistent with her outcry statements. Instead, she testified that she did not remember any of the events. She did not remember being touched, telling anyone about the touching, or going to the doctor to be

23

examined. But it is not required that Amy recall these events to qualify as a testifying witness under Article 38.072. *See Hollinger*, 911 S.W.2d at 39–40; *see also* TEX. CODE CRIM. PROC. art. 38.072, §2(b)(3).

We conclude that Amy testified, thereby meeting the challenged requirement of Article 38.072 to permit Diop to testify as an outcry witness. We overrule Garnett's fourth issue.

## Conclusion

We affirm.

Sarah Beth Landau
Justice

Panel consists of Justices Radack, Landau, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).